## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **vs.**                      **Case No. 07-20166-JWL**

**VICTOR CANALES MEDINA,**

        **Defendant.**
_____

### MEMORANDUM & ORDER

On December 20, 2007, Defendant Victor Canales-Medina was indicted on one count of being a noncitizen previously deported subsequent to a conviction of an "aggravated felony," who was thereafter found in the United States in violation of 8 U.S.C. §§ 1326(a) and (b)(2). (doc. #1)  The matter before the court is Mr. Canales Medina's Motion to Suppress Evidence and Statements.  (doc. # 17)  The court held an evidentiary hearing on April 3, 2008, at which it was discovered that the Immigrations and Customs Enforcement Agent questioned Mr. Medina twice rather than only once as the parties had thought.  At the request of Mr. Medina's counsel, the court permitted Mr. Medina to file supplemental arguments by April 10, 2008 and the Government to file a response by April 17, 2008.   Both parties filed their supplemental memoranda (docs. # 25, 26), and the court took the Motion under advisement.  The court now grants in part and denies in part Mr. Medina's Motion to Suppress Evidence and Statements.

### FINDINGS OF FACT

Officer Jason Gilmore is the records custodian at the Wyandotte County Jail, where Mr. Canales Medina was booked on December 10, 2007.  He testified that there are booking procedures for arrestees at the Wyandotte County Jail, including fingerprinting, photographing, and entering the arrestee's information in the computer.  The arrestee's information is run through different databases to determine whether or not there are any outstanding warrants or holds.    The two main databases used at Wyandotte County Jail are the National Crime Information Center ("NCIC"), a national database that shows outstanding warrants, and ALERT, a local database.   The Immigration Alien Query ("IAQ") is a query within NCIC that is run on any arrestee known to be born outside the United States.[1] The booking process time varies for each individual because it depends on how busy the jail is at the particular time, and the time is extended if the person has not given his true identity.  Those arrested for felonies are placed on a forty-eight hour investigative hold, and those arrested for misdemeanors can be released on bond.  Bond is only one of the requirements prior to release, and he or she may not be free to leave just because he or she has posted bond.  For example, if the arrestee was intoxicated when brought to the jail, the individual is evaluated to make sure he or she is fit for release even if the arrestee has posted bond.    Also, if an arrestee is in the country illegally, he or she would be placed on a detainer until the Immigration and Customs Enforcement (ICE) agent can pick up him or her.  Also prior to release, jail personnel run the arrestee's name through the databases one more time as a double check to make sure nothing was added to the systems or missed by the officers.

---

[1] S*ee Say v. Adams*, 2008 WL 718163, *1 (W.D. Ky. 2008) (explaining that "an 'Illegal Alien Query' ('IAQ') [is] conducted through United States Immigration and Customs Enforcement to determine the alien's legal status within the United States").

Officer Gilmore reviewed the records from Mr. Medina's December 10, 2007, arrest, but he was not present at the time of Mr. Medina's booking.  The booking ledger shows that Mr. Medina was brought into the jail at 1:31 a.m.  It also showed four charges, including a bench warrant for failing to appear in city court, a refusal to submit to a breathalyzer test, a DUI charge, and a writ for an unpaid fine.

Mr. Medina originally gave the name "Rolando Medina" to the arresting officer.  The booking officer ran that name through the database systems.  Specifically, at 1:48am, "Rolando Medina" was run through NCIC, which came back negative, and the ALERT entry came back with a bench warrant for $310.  At approximately 2:00 a.m. the officers found out the arrestee's real name was Victor Medina based on his fingerprint results, a procedure that is done automatically during booking so that the officers know whether the arrestee has given the correct identity.

Mr. Medina's counsel pointed out that the offense report written by the arresting officer shows the name, "Victor Medina," on the space for aliases.  Officer Gilmore testified that he could not say for sure whether that was added prior to the booking officer receiving the information because often the officers go back and write in a newly discovered name rather than writing a new arrest report.  Only "Rolando Medina" was run through NCIC and ALERT initially, and officers at Wyandotte County Jail are trained to run all names present on the arrest report through the databases, indicating that "Victor Medina" likely was added after the initial database searches.[2]

---

[2] "Victor Medina," is listed on the arrest report under "Aliases-Monikers" and appears to be in the same handwriting as the rest of the report.  Officer Gilmore testified that the arresting

When his true identity was revealed around 2:00am, that name was submitted to the IAQ database because the officers knew Mr. Medina was born outside the United States.  The Wyandotte County Jail allows four hours to give IAQ a reasonable time to respond, but results do not always come back in that time.  That was the case here, as IAQ did not respond within four hours as to whether Mr. Medina was illegally in the country.

Based on the four charges listed in the booking ledger, Mr. Medina was eligible to post bond in the cash amount of $100, and he did so.  The booking officer took the money from Mr. Medina for the bond at 1:56 a.m.  The officer then took the money to the records clerk.  The bond receipt was written up by the records clerk at 2:47 a.m.

The jail personnel completed the double-check procedure of running Mr. Medina's name through the databases at approximately 6:14 a.m. on December 10, 2007, about four hours after the submission of the IAQ.  This was the first time that Mr. Medina's real name, "Victor Medina," was run through NCIC.  It came back with a deported felon notice that included the date of deportation, that he is a deported criminal aggravated felon, that he was previously deported by the Bureau of Immigration and Customs Enforcement, his date of birth, and several aliases.

Officer Gilmore testified that based on that information, it was likely that Mr. Medina was in the country illegally.  He also testified that based on his experience, the booking procedure and database checks did not take an unusual amount of time, and that if the

---

officers in DUI cases typically do not stay at the jail for the whole booking process.  The court does not find that this means that the name, "Victor Medina," was originally on the arrest report because his real name was discovered within the first thirty minutes, so the officer would not have had to remain for the entire booking process to write in that name.

information about Mr. Medina's alien status had come back at the time the officers initially ran the alias, "Rolando Medina," he would not have been free to leave.

The booking officers notified ICE based on the NCIC results regarding his deported felon status and previous aggravated felony conviction.[3]  ICE Agent Larry Spake came on duty at 6:00 a.m., before the NCIC result was obtained by jail personnel.  He talked to the booking officer over the phone, placed a verbal detainer on Mr. Medina, and then faxed over a detainer to the Wyandotte County Jail shortly after 7:00 a.m.  Agent Spake testified that when he picked up Mr. Medina, he was in ICE custody and no longer in the custody of the Wyandotte County Jail.

Agent Spake said his initial contact with Mr. Medina was when he interviewed Mr. Medina around 10:00 a.m. when the agent arrived at the jail.  He asked Mr. Medina to verify his name, date of birth, nation of birth, and if he had been deported previously.   Agent Spake explained that in this first interview, which was apparently conducted in part at the jail and in part at the agent's office, Mr. Medina was asked all the questions on the form that Mr. Medina answered in the second interview that took place three days later.  Agent Spake said that the interview was for administrative deportation purposes, so no *Miranda* warnings were given and it was not a sworn interview.   He also said that at that time he did not know why Mr. Medina was previously deported, as he only learned why after he received Mr. Medina's A-File.[4]

---

[3] The specifics of these facts are discussed in greater detail in Part II of the DISCUSSION.

[4] "An A-file [otherwise known as an 'Alien File'] is kept by the INS and its successor agencies on foreign nationals who come in contact with the government. It contains a wide range of documents, including applications for benefits, pictures, birth certificates, marriage certificates, internal memos, records of enforcement actions and deportations, and fingerprint cards."  *United States v. Earle*, 488 F.3d 537, 539 n.2 (1st Cir. 2007).

Agent Spake then verified Mr. Medina's information.  This included obtaining from storage and reviewing Mr. Medina's A-File. He received the file a day or two later and interviewed Mr. Medina again on December 13, 2007.  He said that on December 13, 2007, Mr. Medina was read his *Miranda* rights and formally interviewed because they had established and had suspicion, as well as that Mr. Medina had admitted, that he had previously been deported. *Miranda* warnings were given in English and Spanish; Mr. Medina appeared to understand the warnings as they were read to him in both languages, and he did not ask any questions.  Mr. Medina signed a waiver of his *Miranda* rights and gave a fingerprint of his right index finger on the same form.

Before giving the *Miranda* warnings at the second interview, Agent Spake explained to Mr. Medina that based on Mr. Medina's A-File, combined with "his testimony," and "his statements," that criminal prosecution could be recommended.  Agent Spake explained the purpose of that interview—that because of Mr. Medina's history of being previously deported and removed by an immigration judge as an aggravated felon that it is within the discretion of the Department of Homeland Security whether or not to charge him with a felony.  Mr. Medina then answered the questions in writing, including that he had been previously deported and that he had previously been convicted of a crime in the United States.

## DISCUSSION

Mr. Medina moves to suppress his statements to government agents following his arrest on December 10, 2007, as well as information regarding his immigration status derived from the seizure of his person and interviews by government agents, including his A-File.  The basis he

6

alleges for suppression is two-fold, including that the information was fruit of his illegal detention by officials at the Wyandotte County Jail and because he was not given *Miranda* warnings prior to his initial interview with Agent Spake.  Furthermore, he alleges that statements taken by Agent Spake after he administered *Miranda* warnings on December 13, 2007, should be suppressed because the initial interview conducted without *Miranda* warnings negated its voluntariness under the standard set forth in the plurality opinion in *Missouri v. Seibert*, 542 U.S. 600 (2004).

### I.        Reasonableness of time of detention

Mr. Medina alleges that he should have been released on bond after he had met all the "legal" requirements at 2:47 a.m., including fingerprinting, photographing, and making the required bond payment.  He claims that he was detained without any probable cause or reasonable suspicion for over three hours after he had met all the requirements for release for his misdemeanor offenses.  Mr. Medina seeks to suppress information received and statements regarding his immigration status made as a result of the allegedly unreasonable detention after he posted bond.  Mr. Medina does not cite to any supporting legal authority for this argument.

"The reasonableness of the detention is a matter for the trier of fact, who must determine 'whether the period of detention is reasonable in light of all the circumstances accompanying the arrest, including transportation, booking, filing, photographing, fingerprinting, identity verification, and criminal record 'wanted' checks, as well as the number of individuals to be processed with the detainee in question." *Austin v. Hamilton*, 945 F.2d 1155, 1162 (10th Cir. 1991) (*Bivens* action against federal agents), (*overruled on other grounds by*, *Johnson v. Jones*,

515 U.S. 304 (1995). Thus, the Tenth Circuit has impliedly recognized that identity verification and criminal background checks are permissible forms of administrative procedures incident to arrest. *Id.*; *see also Sanders v. City of Houston*, 543 F.Supp. 694 (S.D. Tex. 1982) ("This Court concludes that 'administrative steps' . . . include more than transportation, booking, and filing charges. The procedures enumerated in the preceding paragraphs involve legitimate police concerns. . . .[I]t is the Court's determination that such activities-completing paperwork, searching the suspect, inventorying property, fingerprinting, photographing, checking for prior record, laboratory testing, interrogating the suspect, verifying alibis, ascertaining similarities to other related crimes, and conducting line-ups-may be proper administrative steps incident to an arrest in a given case."). Both the approximately four hour wait due to the potential IAQ return and the double check of Mr. Medina's name through NCIC and ALERT at around 6:14 a.m., shortly after the four hour waiting period for the IAQ had expired, are permissible "administrative procedures."

Just because Mr. Medina had given the bond money and his fingerprints did not make detaining him for the completion of the remaining administrative procedures unreasonable. This is particularly true where Mr. Medina himself contributed to the delay by initially giving the arresting officer a false name. Moreover, had he given his real name from the beginning and had been entered into the databases correctly, he would not have been eligible for release. *See generally United States v. Rollins*, 190 Fed. Appx 739, 745, 2006 WL 3007493, *4 (Oct. 17, 2006) ("[T]he length of the 'process' was of [the defendant's] own creation. Had [he] not committed the misdemeanor of false informing and given his true identity when Detective Cheshire first approached [the defendant's motel room], a warrant check would have immediately occurred

leading to Rollins' arrest. . . . [The defendant's] criminal conduct in delaying the search for nearly an hour cannot be allowed to invalidate an otherwise valid search."). Furthermore, because the officers knew both that Mr. Medina had lied about his identification to the arresting officer and that he was born outside the United States, they had at the least reasonable suspicion to detain Mr. Medina while waiting for four hours for the results of the IAQ. *See id.* at 744-45 ("An 'investigative detention' is justified so long as it is supported at its inception by a reasonable suspicion of criminal activity and the extent of the detention is related in scope to the circumstances giving rise to the interaction." (citing *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 185 (2004))).

This four hour period also is significantly below the forty-eight hours that is often deemed a reasonable time for detention. *See County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). "[W]e believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement. . . . [N]onetheless . . . the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* There is no evidence of any showing of unreasonable delay comparable to the examples set forth in *McLaughlin*. Instead, the jail personnel spent the approximately six hours that Mr. Medina was detained after his arrest (prior to the ICE detainer being placed on him) booking, photographing, fingerprinting, verifying his identity, and running criminal background checks. At no time did the jail hold Mr. Medina when these administrative procedures were not being conducted. Accordingly, the court

finds that the period of detention was reasonable; the evidence shows that the time was spent performing related administrative tasks and that Mr. Medina's own action contributed to the delay in making the final determination that he was ineligible for release.

Even if this court did conclude that Mr. Medina was detained illegally, the court still would not suppress Mr. Medina's fingerprints.  They were obtained as the result of the booking procedure, and there is no evidence that his arrest or detention was exploited for investigatory objectives.  *United States v. Olivares-Rangel*, 458 F.3d 1104, 1116 (10th Cir. 2006) ("[I]n the absence of evidence that the illegal arrest was purposefully exploited for investigatory objectives, fingerprints taken as part of a routine, booking procedure are not fruit of a poisonous tree.").  Instead, the arrest was for a DUI, and the fingerprints were routinely taken in connection with that arrest for identification purposes.  *See id.* (citing cases that distinguish when fingerprints are taken solely for the purpose of an ICE investigation and those taken for identification purposes as part of a routine booking procedure).[5]

Accordingly, the detention did not violate Mr. Medina's rights, and the information obtained as a result of the booking procedure and detention by the Wyandotte County jail will not be suppressed.  Mr. Medina's motion on this basis is denied.

---

[5]  The Government also asserts that statements made to the booking officer were part of a routine booking procedure and that officer had no reason to suspect that it was likely to be incriminating, so even if the arrest or detention was illegal, that information should not be suppressed.  The court finds that it is unnecessary to decide at this point since the detention did not violate Mr. Medina's rights.  Also, the evidence in the record is insufficient to conclude whether at the time the question regarding Mr. Medina's country of birth was asked, what information was known, and therefore, the court cannot conclude whether the officer should have known that the question would likely elicit incriminating information.  *See United States v. Parra*, 2 F.3d 1058, 1067-68 (10th Cir. 1993) (finding that while normally routine booking questions do not constitute an "interrogation," in that case the individual was asked about his true name to link him to his incriminating immigration file so *Miranda* warnings were required).

## II.      Statements prior to *Miranda* warnings

Mr. Medina seeks to suppress the statements made to Agent Spake on December 10, 2007, because he was not given *Miranda* warnings prior to the questioning.  The Government argues that the questioning did not qualify as an "interrogation," so *Miranda* warnings were not required.  The court agrees with Mr. Medina.

A law enforcement officer need only give Miranda warnings if he or she is performing a custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Ultimately, the issue of whether Mr. Medina was interrogated turns on whether the questioning was reasonably likely to elicit an incriminating response.  *United States v. Rambo*, 365 F.3d 906, 909 (10th Cir.2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)); *see also United States v. De*lay, 2003 WL 22327117, *9 (D. Kan. Sept. 30, 2003) ("It would be unreasonable under the circumstances to hold [the officer] accountable for the unforeseen incriminatory nature of the defendant's response to a straightforward, non-incriminating question.").  The test is an objective one, *id.*, and whether the questioning was reasonably likely to elicit an incriminating response must be evaluated under all the circumstances involved in a given case,  *United States v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006).  While the agent's subjective intent is relevant, the "focus is on the perception of the defendant."  *Id.*

Agent Spake testified that at the point of the first interview, it was administrative in nature such that he was trying to determine whether Mr. Medina should be deported.  *See United States v. Valdez*, 917 F.2d 466, 469 (10th Cir. 1990) (deportation proceedings are civil rather than criminal, so the warnings required by *Miranda* are not automatically applicable). He also

testified that he did not know until he received Mr. Medina's A-File that a criminal prosecution may be pursued.  There also was a three day delay before he again interviewed Mr. Medina and told him that criminal charges may be pursued by the Department of Homeland Security.

Officer Gilmore, however, testified that the NCIC return at 6:14 a.m. showed that Mr. Medina is a deported criminal aggravated felon, and that ICE was contacted based on that NCIC result.  At the hearing, when Agent Spake was asked "How did you initially get involved?," he responded "Through contact with the Wyandotte County Jail.  Telephone contact was informed that they had an individual in custody whose NCIC showed a past history as a prior deport as an aggravated felon from the United States."   While it is not entirely clear from this statement whether he was individually contacted, Agent Spake then went on to say that he came on duty at 6 a.m. (after the NCIC result was received by jail personnel) and *he* was contacted around that time.  But he then stated that he was told that Wyandotte County Jail had a person in custody with a previous removal, but he did not state that he was told anything about the rest of the NCIC result.  He also explained that he had suspicion to open the investigation but he was not certain whether or not Mr. Medina was the individual for whom the NCIC result came back.  He also testified that the detainer was placed on Mr. Medina based on the NCIC result showing that he was a previously deportable felon, indicating he had access to and based his detainer on the NCIC results.  Also, Agent Spake himself talked to the booking officer and is the one who sent the detainer shortly after the NCIC result was received.  He further explained that the NCIC result revealed Mr. Medina's alien number that corresponds with his A-File, which Agent Spake later retrieved.  As previously noted, that NCIC result, according to both Agent Spake's and Officer Gilmore's testimony, included that Mr. Medina was a previously deported aggravated

felon.  Based on these facts, the court finds that Agent Spake knew that based on the NCIC result Mr. Medina had an aggravated felony and a previous removal, which constitute elements of the very crime for which Mr. Medina is being prosecuted in this case.[6]

Agent Spake also explained that he asked Mr. Medina the same questions during the first and second interview even though one investigation was said to be administrative and the other criminal.  When asked "So you would have . . . gotten all of the same information when you took him from the jail that you later got on the formal sworn statement . . .?," Agent Spake responded, "Correct."  Those questions include whether Mr. Medina had previously been deported and whether he had ever been convicted of a crime in the United States, again both of which are elements of the crime for which he was indicted in this case, only ten days after the initial interview.  The questions were not limited to generic identification.

The rule applied to determine whether there is an interrogation for purposes of Miranda is not whether there is a criminal investigation currently underway.  *See generally Mathis v. United States*, 391 U.S. 1, 4 (1968) (routine "civil" tax investigation questioning of jail inmate required *Miranda* warnings even when no related criminal prosecution was currently being pursued).  Agent Spake's testimony that the investigation did not turn criminal until after he received the A-File after the initial interview, therefore, is not dispositive.  Rather, the test is whether under

---

[6] Chapter 8, Section 1326(b)(2), United States Code, for which Mr. Medina is charged states:
    (b) Criminal penalties for reentry of certain removed aliens
    Notwithstanding subsection (a) of this section, in the case of any alien described in such subsection--
. . . .
        (2) whose removal was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such Title, imprisoned not more than 20 years, or both

all the circumstances in a given case, the questions asked were reasonably likely to elicit an incriminating response.  While Agent Spake's subjective intent may have been an administrative inquiry, the court finds that an objective view of the evidence shows that Agent Spake knew or, at the very least should have known, that his questions were reasonably likely to elicit incriminating responses both based on the NCIC information and the nature of the questions asked.  *See Rhode Island v. Innis*, 446 U.S. 291, 301-02 (1980) ("[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (emphasis in original)).

Furthermore, the Government does not contest that the defendant was in custody.  (doc. # 26, at 9 ("While in the present case the defendant was in custody at the time he was initially questioned by Agent Spake, he was in custody for state charges, not for immigration charges.")).[7]  Based on this, the Supreme Court's reasoning in *Mathis* supports the conclusion that the Government's argument should be rejected.  *Mathis v. United States*, 391 U.S. 1, 4

---

[7] If the government did not concede that Mr. Medina was in custody, the court would find that he was, even if he was transported to Agent Spake's office for part of the questioning. *See, e.g., United States v. Kadem*, 317 F.Supp. 2d 239 (W.D.N.Y. 2004) (finding that alien already in custody at prison was in custody for purposes of Miranda even though he was transported to an interrogation room and the investigator with ICE was there not as part of a criminal investigation but to determine the defendant's alienage; a reasonable person in the defendant's position would not feel free to leave the interrogation room); *see also United States v. Ellick*, No. 97-2163, 1998 WL 794971, *5 (10th Cir. Nov. 16, 1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)) ("A person is 'in custody' for purposes of *Miranda* if 'a reasonable person in the suspect's position would have understood his situation as the functional equivalent of formal arrest.'").

(1968); (doc. # 26, at 9-10).  In that case, an Internal Revenue Agent questioned the defendant in a state penitentiary, where the defendant was jailed for a previous conviction.  The Government argued that the questioning was part of a routine tax investigation where no criminal proceedings may even be brought and that the defendant was incarcerated for an entirely separate offense than what the IRS was there to question him about.  The Court rejected the arguments, explaining that the Government's reasoning was contrary to the purpose of *Miranda* and noting that civil interrogations are often likely to elicit incriminating responses.  *See also United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983) (relying on *Mathis*, the court held that *Miranda* warnings were required before an interview by an INS (now ICE) agent of a jail inmate even though the agent characterized the questioning as "civil"; the agent knew that evidence of alienage, coupled with the state charge for possession of firearms by an alien, could lead to federal prosecution, and therefore, answers would be highly incriminating, and the court also pointed out that the "close sequence of 'civil' investigation and criminal prosecution raise[d] the possibility that the initial investigation was both civil and criminal"); *cf. United States v. Salgado*, 292 F.3d 1169, 1171 (9th Cir. 2002) (INS agent interviewed the defendant, while incarcerated, in March 1998, asking generic identification questions, to determine whether he should be deported at the end of his sentence.  After being deported in May 1998, the defendant was arrested in the United States in June 1999, and the Government sought to use the 1998 statements against the defendant in his 1999 charge for immigration law violations; the court held *Miranda* warnings were not required prior to the March 1998 interview because "the response only became incriminating after the passage of a substantial period of time and after the defendant had been deported, had illegally reentered the country, and had been arrested on

state charges unrelated to his immigration status. . . [and] the person asking questions did not know from pending state charges that a federal criminal prosecution relevant to nationality could result; [the agent] did not refer the alien for criminal investigation or initiate one [herself]; and the defendant[ was] not prosecuted forthwith on federal immigration charges.").[8]

As such, any statements made by Mr. Medina on December 10, 2007, in response to Agent Spake's questions, accordingly are suppressed. Mr. Medina's A-File, however, which Agent Spake obtained based on Mr. Medina's alien number in the NCIC report is not suppressed because it would have been inevitably discovered even if Agent Spake did not interrogate Mr. Medina on December 10, 2007.

### III. Statements made after *Miranda* warnings

---

[8] The conclusion that there was an "interrogation" in this case is also consistent with a point on which the Tenth Circuit distinguished *United States v. Mata-Abundiz*, 717 F.2d 1277 (9th Cir. 1983) in its case, *United States v. Alvarado-Lopez*, 991 F.2d 806 (10th Cir. 1993) (unpublished). In *Alvarado-Lopez*, Border Patrol Agents went to the defendant's home and questioned him to determine whether they should place him in administrative custody. The fact that the "defendant was in his residence, neither in custody on criminal charges nor under suspicion of criminal activity, when he volunteered his illegal alien status," *id.* at *3, was critical to the Tenth Circuit's conclusion that the questioning was administrative and "the officers were not even considering criminal charges," so Miranda warnings were not required. *Id.* at *2 ("One key to the application of *Miranda* is the expectation that questioning will, or might, produce incriminating responses."). The court distinguished *Mata* based on the fact that the defendant was not already in custody: "In a major and critical way *Mata* is distinguishable because the defendant was in jail on state charges when he told INS agents he was a Mexican citizen. Although the INS investigator characterized his questioning as a 'routine, civil investigation,' the Ninth Circuit held *Miranda* applied solely because the defendant was in custody when the statement was made. This fact made the civil-criminal distinction irrelevant." *Alvarado-Lopez*, 991 F.2d 806, at *2 (citing *Mathis v. United States*, 391 U.S. 1 (1968)). Here too, because Mr. Medina was in custody at the time of the initial interview, albeit initially for a state charge unrelated to immigration laws, *Miranda* warnings were required.

Mr. Medina argues that the written statements taken on December 13, 2007, should be suppressed because although *Miranda* warnings were administered prior to that interview, Agent Spake asked the same questions that he had in the previous interview without *Miranda* warnings.  Mr. Medina relies on *Missouri v. Seibert*, 542 U.S. 600 (2004) (plurality), which addressed "[t]he technique of interrogating in successive, unwarned and warned phases," and the Government provided no response to the applicability of that case.

For *Miranda* safeguards to apply, "the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Ritchie*, 35 F.3d 1477, 1485 (1994) (citations omitted).  For the December 13, 2007, interview as opposed to the December 10, 2007, interview, the Government does not dispute that Mr. Medina was in custody or that there was an interrogation.  Instead, the Government, in passing, points to the fact that Agent Spake interviewed Mr. Medina after advising him of his *Miranda* rights, made it clear that he was investigating him for possible criminal charges, and that Mr. Medina signed a waiver of those rights.  The Government bears the burden of proving by a preponderance of the evidence that a defendant waived his *Miranda* rights and the voluntariness of the statements.  *Missouri v. Seibert*, 542 U.S. 600, 609, n.1 (2004) (plurality).

Statements made prior to receiving *Miranda* warnings must be suppressed, as the court has concluded as to Mr. Medina's December 10, 2007, statements to Agent Spake, but "it does not necessarily follow that every subsequent voluntary statement made by a suspect must be suppressed as well." *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).  "[T]he admissibility of any subsequent statement should turn in these circumstances on whether it is knowingly and voluntarily made." *Id.* at 309.  "In such circumstances, the finder of fact may reasonably

conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.* at 314.

As stated previously, Mr. Medina urges the court to apply the plurality's opinion of the more recent case of *Missouri v. Seibert* rather than *Elstad*'s knowing and voluntary standard. In *Seibert*, a police officer deliberately failed to give *Miranda* warnings until the defendant had confessed, then issued the warnings and she repeated her confession. The Government sought to introduce the statements made after the *Miranda* warnings were given. The Court set forth five relevant facts for a court to consider in determining "whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615 (plurality).

In his concurring opinion, Justice Kennedy, rather than replacing the standard set forth in *Elstad*, held that the *Seibert* factors should only be applied where there is evidence of officers using the "deliberate two-step strategy." *Seibert*, 542 U.S. at 603 (Kennedy, J., concurring). Statements made pursuant to that strategy must be excluded unless curative measures, such as a break in time between statements coupled with an explanation that the earlier statements would be inadmissible, are taken. He explained that the majority's holding was too broad and that where there is no intentional circumvention, *Oregon v. Elstad*, 470 U.S. 298 (1985), still applies and only requires that the post warning confession was knowingly and voluntarily made.

This court must first decide whether to apply the plurality's objective test or Justice Kennedy's more subjectively-based test.  The Tenth Circuit discussed both tests in *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006), but because it concluded that the defendant's statements would be admissible under either test, the court concluded that the case did "not require [them] to determine which opinion reflects the holding of *Seibert*."  The court also cast doubt on the application of the principle of *Marks v. United States*, 430 U.S. 188 (1977), to *Seibert* that where a fragmented court decides a case, the holding of the court is the position taken by those who concur on the narrowest grounds because "the plurality and concurring opinions take distinct approaches, and there is no 'narrowest opinion' representing the 'common denominator of the Court's reasoning.'"  *Carrizales-Toledo*, 454 F.3d at 1151.  But, this court will follow the approach of other circuits that have been faced with the issue and treat Justice Kennedy's opinion as the holding of *Seibert*.  *See United States v. Hernandez*, 200 Fed. Appx. 283, 286 n.1, 2006 WL 2602078 (5th Cir. Sept. 12, 2006) (reiterating that Justice Kennedy's opinion represents the holding based on the analysis set forth in *Marks*, and that "[m]ost other Circuits that have considered this issue have come to the same conclusion," distinguishing *Carrizales-Toledo* because the Tenth Circuit questioned the applicability of *Marks*, but citing to several cases that have accepted Justice Kennedy's concurrence as the holding: *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006); *United States v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006); *United States v. Naranjo*, 426 F.3d 221, 231-32 (3d Cir. 2005); *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005); *United States v. Stewart*, 388 F.3d 1079, 1086-87 (7th Cir. 2004).[9]

[9] While whether to suppress the post *Miranda* statements is a closer call if the court

Additionally, while this court acknowledges the points made by the *Carrizales-Toledo* court, it also believes that Justice Kennedy's narrower view should be followed here because there is a common denominator between the plurality and Justice Kennedy. Five justices in *Seibert* were moved to alter the prior rule in *Elstad* out of obvious displeasure with a conscious police strategy of engaging in a two-step interrogation to avoid *Miranda*. *Seibert*, 542 U.S. at 611-12 (plurality). But the fifth vote to do so came with Justice Kennedy's insistence on an explicit recognition of intentional circumvention as a determinative factor. But for his willingness to concur in the result on that basis, *Elstad* would still be controlling. Though a majority of the Court may not have agreed with Justice Kennedy on this point, just as surely a majority of the Court rejected abandonment of *Elstad* where no intentional circumvention is involved. Moreover, the concurrence of Justice Breyer, who also joined the plurality opinion, reflects acceptance of Justice Kennedy's attitude about the subject in stating explicitly that he agreed that a good faith exception should apply. *Seibert*, 542 U.S. at 618 (Breyer, J., concurring).

---

applied the *Seibert* plurality factors rather than Justice Kennedy's analysis, the court finds that the outcome would be the same. Even though the questioning was the same in both interviews and Agent Spake was present at both, the similarity of the questioning was due to the basic nature of the questions regarding identity, citizenship, and prior deportation, as all these are relevant to both administrative and criminal immigration investigations, not necessarily one continuous interrogation as was the case in *Seibert*. Agent Spake had evidence independent of those statements, Mr. Medina's A-File which was obtained with information from the Wyandotte County jail, by the time the second interview occurred, and there was a break in time of three days between the interviews. *See Carrizales-Toledo*, 454 F.3d at 1152 (finding that the questioning was in "two distinct sessions" when officer moved defendant to a different car and waited for other agents to arrive before second round of questions). Accordingly, a more thorough application of the *Seibert* factors would not alter this court's conclusion.

Based on Justice Kennedy's concurrence, "*Seibert* requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken; where that strategy is not used, '[t]he admissibility of postwarning statements [ ] continue[s] to be governed by the principles of *Elstad*.'" *United States v. Courtney*, 2006 WL 2474780 (5th Cir. 2006) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in judgment)).  "[I]f the district court determine[s] that [the defendant's] first . . . statements were obtained in violation of *Miranda*, the next inquiry would have been whether a deliberate two-step strategy was used." *Id.* There is no evidence tending to show that Agent Spake was intending to use a two-step strategy.  Rather, he testified that he did not *Mirandize* him originally because he thought that he did not need to because he was acting in an administrative capacity.  *Seibert*, 542 U.S. at 619 ("An officer may not realize that a suspect is in custody and warnings are required.") (Kennedy, J., concurring). As this court has explained, in this case *Miranda* warnings were required for the first interview, but the factual scenario is somewhat unique because often in the context of administrative investigations, *Miranda* warnings are not required.  *See, e.g.*, *Alvarado-Lopez*, 991 F.2d 806.

This is in stark contrast to *Seibert* in which there was a "police protocol for custodial interrogation that call[ed] for giving no warnings of the rights to silence and counsel until interrogation produced a confession." *Seibert*, 542 U.S. at 604 (plurality).   Officer Hanrahan questioned Ms. Seibert without *Miranda* warnings for thirty to forty minutes.  After she finally confessed, she was given a twenty minute break, and then Officer Hanrahan gave her *Miranda* warnings and obtained a waiver.  He resumed the questioning by referencing back to the prior conversation and ultimately eliciting the confession again.  "Officer Hanrahan testified that he

made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 605-06.  This deliberate procedure, intentionally taught to the officers, is distinguishable from Agent Spake's questioning based on the principle that administrative questioning often does not require *Miranda* warnings.

Thus, on the specific facts of this case, because there was no deliberate intent to circumvent the *Miranda* safeguards by not giving the warnings prior to the first interview, the Government must only prove that the waiver was made knowingly and voluntarily pursuant to *Elstad*.  Based on the facts that Mr. Medina was read the rights from the waiver form; that he signed the form and wrote his answers to the questions on the same form; that he responded accurately to the questions asked indicating a sufficient level of comprehension; that the rights were read in both English and Spanish; and that Mr. Medina asked no questions based on the reading of those rights, the court finds that the Government has met its burden to show that the waiver was knowingly and voluntarily made.  Mr. Medina's Motion to Suppress is denied as to his statements to Agent Spake on December 13, 2007.

**IT IS THEREFORE ORDERED BY THE COURT** that Mr. Medina's Motion to Suppress Evidence and Statements (doc. # 17) is granted in part as to the statements made to Agent Spake on December 10, 2007, and denied as to Mr. Medina's remaining claims.

**IT IS SO ORDERED.**

Dated this 12th day of May, 2008.

<u>s/ John W. Lungstrum</u>
John W. Lungstrum
United States District Judge